UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
MACK TRUCKS, INC.,

                    Plaintiff,

     -against-                      Civil Action No:
                                    07 CV 3631 (PAC)

JOHNNY M., LLC, and COMPONENTS BY   Honorable Paul A. Crotty
JOHN McCOY, INC.,

                                    PLAINTIFF'S RULE 26
                    Defendants.     INITIAL DISCLOSURE

----------------------------------X

          The Plaintiff, Mack Trucks, Inc. (hereinafter

"Mack"), by and through its attorneys Maimone & Associates

PLLC, as and for its initial disclosure pursuant to FRCP 26,

sets forth the following:

     1.   REQUIRED DISCLOSURE:

          (A)  Persons possessing information:

                    i. Randy DeLillo, General Manager,
                       Licensing & Merchandising, Mack Trucks,
                       Inc., 2100 Mack Boulevard, Allentown, PA
                       18103; Familiar with the facts and
                       circumstances surrounding each of Mack's
                       claims, including but not limited to,
                       the negotiation and formation of the
                       Trademark License Agreement and
                       Guaranty, defendants' failure to perform
                       and Mack's compliance with all terms of
                       the Agreement.

                   ii. Phil Raia, Leveraged Marketing
                       Corporation of America (LMCA), 156
                       West 56th Street, New York, New York
                       10019; Familiar with the facts and
                       circumstances surrounding the
                       negotiation and formation of the
                       Trademark License Agreement and
                       Guaranty, defendants' failure to perform
                       and Mack's compliance with all terms of
                       the Agreement.

23509

    iii. Tim Orenbuch, 3605 Indian Queen Lane, First Floor, Philadelphia, PA 19129.  Familiar with the facts and circumstances surrounding the negotiation and formation of the Trademark License Agreement and Guaranty, defendants' failure to perform and Mack's compliance with all terms of the Agreement.

 (B) <u>Relevant Documents</u>:  Copies of the following documents are enclosed herewith:

   i. Exhibit "A": Trademark License Agreement;

   ii. Exhibit "B": October 10, 2005 letter on behalf of Johnny M;

   iii. Exhibit "C": Guaranteed Minimum Royalty payment checks received from Components;

   iii. Exhibit "D": October 24, 2006 termination letter from Mack;

   iv. Exhibit "E": April 9, 2004 letter from John McCoy;

   v. Exhibit "F": payment checks from Success Apparel.

 (C) <u>Computation of Damages</u>:  The damages sought against Components total $491,000.00 computed as follows:

| | |
|---|---|
| Guaranteed Minimum Royalty: | $750,000.00 |
| 4 payments by Components: | -$259,000.00 |
| Balance due: | $491,000.00* |

 *Interest is requested on this amount as set forth in the Complaint.

 The damages sought against Johnny M total $963,000.00 computed as follows:

| | |
|---|---|
| Guaranteed Minimum Royalty: | $1,272,000.00 |
| 4 payments by Components: | -$ 259,000.00 |
| Payments by Success Apparel: | -$  50,000.00 |
| Balance due: | $963,000.00* |

       \*Interest is requested on this amount as set forth in the Complaint.

       Mack further seeks costs, disbursements and attorneys' fees from each defendant as provided in the Trademark License Agreement and Guaranty.

       (D)  <u>Insurance</u>:  Not applicable.

    2.  <u>Expert Disclosure</u>:

       To date, Mack has not retained an expert with regard to any claims herein; if and when an expert witness is retained, the required disclosure will be promptly made.

       **PLEASE TAKE NOTICE**, that Mack reserves its right to amend, supplement and/or furnish additional, different or other information as it becomes available during the conduct of or until the completion of discovery.

DATED:  Mineola, New York
       August 6, 2007

                  Respectfully submitted,
                  MAIMONE & ASSOCIATES PLLC

                                                                                              

BY:                                      
                  MARY D. MILONE  (MDM5868)
                  170 Old Country Road
                  Suite 609
                  Mineola, NY 11501
                  (516) 390-9595
                  Attorneys for Plaintiff

TO:  NEIL L. FUHRER, ESQ.
     Attorney for Defendant Components
     750 Third Avenue
     New York, New York 10017
     (212) 681-7888

     ROBERT FIERMAN, ESQ.
     Attorney for Defendant Johnny M
     52 Vanderbilt Avenue, Suite 1007
     New York, NY 10017
     (212) 490-3400

3

EXHIBIT "A"

## TRADEMARK LICENSE AGREEMENT

AGREEMENT effective as of April 2, 2004 (the "Effective Date"), by and between Mack Trucks, Inc., a Pennsylvania Corporation, having its principal office at 2100 Mack Blvd., Allentown Pennsylvania 18103 ("Licensor"), and Johnny M LLC, a Limited Liability Company, having its principal office at 20 West 55th Street, New York, New York, 10019, ("Licensee").

WHEREAS, Licensor is the owner of the Licensed Marks identified in Exhibit "A" attached hereto, ("Licensed Marks"), and has the right to grant Licensee the license, right and permission to use the Licensed Marks, and

WHEREAS, Licensee is in the business of designing, manufacturing, marketing, distributing and selling articles described and specified hereinafter, and desires to secure the license, right and permission to use the Licensed Marks upon, and in connection with, the designing, manufacturing, marketing, distributing and selling of such articles or performing services, and

WHEREAS, the articles that are the subject of this Agreement have been defined by the parties as certain men's, ladies and children's apparel along with certain bags and backpacks, identified in Exhibit "B" attached hereto (hereinafter called "Licensed Items") and;

WHEREAS, Licensor desires to grant to Licensee, and Licensee desires to accept from Licensor, a license to use the Licensed Marks in the design, manufacture, advertising, sale and promotion of the Licensed Items, subject to each of the terms, provisions and conditions of this Agreement.

NOW, THEREFORE, in consideration of the promises and of the mutual agreements, covenants and provisions contained herein, the parties hereto do hereby agree as follows:

## ARTICLE 1
## GRANT OF LICENSE AND DESIGNATION OF LICENSED ITEMS

1.1    Upon the Effective Date of this Agreement, Licensor hereby grants to Licensee, for the period hereinafter specified and upon the terms, provisions and conditions of this Agreement, the exclusive right and license to use the Licensed Marks within the geographic area described in Article 2 hereof, in the design, manufacture, advertising, sale and promotion of the Licensed Items. However, Licensee acknowledges that Licensor will sell its licensed promotional apparel made by other manufacturers through its promotional merchandise program via in-house merchandise

catalogs, corporate stores and its Internet site. Licensee also acknowledges that a terminated Licensee will be selling its remaining licensed T-shirts and fashion caps in selected retail stores until March 31, 2005 the end of its contractual "sell off" period.

1.2    In the event of any disputes between the parties to this Agreement regarding the definition of Licensed Items, the final decision regarding such definition shall rest in Licensor's sole and absolute discretion. The rights granted to Licensee herein are limited to use on or in connection with the Licensed Items and Licensee specifically agrees not to use the Licensed Marks in any manner or on any product, service or item, except as set forth in this Agreement or as subsequently agreed to by Licensor in writing.

## ARTICLE 2
## GEOGRAPHIC AREA AND DISTRIBUTION CHANNEL

2.1    Geographic Area. The rights granted to Licensee hereunder may be exercised by Licensee in the United States and Canada (the "Territory"), and Licensee shall have exclusive rights with respect to the Licensed Items with the exception of those conditions as outlined above in Article 1. Upon Licensee's request, Licensor may, in its discretion, extend the Territory in which Licensee may exercise said rights, but any such extension shall, in each instance, be evidenced by a written and duly executed amendment to this Agreement for such periods and upon such terms and conditions as shall be determined and agreed upon by both the Licensee and the Licensor.

2.2    Distribution Channel. Licensee acknowledges that the Licensed Marks are well known and highly recognized by the general public and associated in the public mind with Mack's core business of high standards and that the Licensed Marks possess special, unique and extraordinary characteristics. Licensee agrees to maintain Mack's standards and protect the characteristics and value of the Licensed Marks by distributing and positioning the Licensed Items in retail stores that are commonly referred to in the market as "mid-market" stores, excluding all drug stores, supermarkets, mass market and deep discount stores. In the event of any question regarding the type of store or stores to which this requirement applies or if an opportunity to distribute the Licensed Items in stores outside the established mid market retailers and if such opportunity could materially increase the sales performance over the Term of this Agreement, then Licensee shall first request Licensor's approval of a proposed store or stores. Licensor shall consider such request and respond back to Licensee within ten (10) business days with the exception of when such request is given to Licensor during Licensor's scheduled summer vacation schedule or shutdown period, at which time the response by Licensor shall be 20 business days. The final decision regarding same shall be determined by Licensor. Anything contained in this Agreement notwithstanding, Licensor specifically approves those mid-market retailers set forth on Exhibit "C" hereof. Licensee acknowledges that Licensor may change such standards from time to time during the Term of this Agreement and that the changed standards shall apply to Licensee after reasonable notice thereof, except such changes shall not

prohibit Licensee from continuing to do business with entities it was then or had during the term hereof done business with.

Licensor shall have the right, at any time, and from time to time, to disapprove of the sale of Licensee's Licensed Items to particular wholesale and/or retail outlets, including the right to disapprove of outlets that were previously acceptable if and only if such outlet engaged in acts or omissions that had an adverse effect on the Licensed Mark and did not cure same after reasonable written notice. Unless prior written approval is obtained from Licensor, Licensee is specifically prohibited from the sale and distribution of the Licensed Items through (i) any disapproved outlets, and (ii) any factory outlet stores, wholesale stores, warehouse sales, parking lot sales, swap meets, flea markets and similar sale or disposal techniques. Licensee's failure to comply with the requirements of this Article shall constitute a material breach of this License Agreement and Licensor may, at its sole option, terminate Licensee's rights under this Agreement for failure to adhere to these retailing and marketing standards and/or obtain specific performance to enjoin any such actions or threatened actions by Licensee. Licensor's determination as to whether a retail outlet satisfies the criteria of this Article shall be final and binding as between Licensee and Licensor.

## ARTICLE 3
## TERM OF AGREEMENT

3.1    Initial Term. The Initial Term of this Agreement shall be for three (3) years commencing on the April 2, 2004 and ending on March 31, 2007, at midnight Eastern Daylight Saving Time, unless sooner terminated.

3.2    Extension Terms. Licensor hereby grants to Licensee the option to extend the term of this Agreement for three (3) one-year extension terms commencing April 2, 2007 and ending March 31stof each respective year and for an additional extension term consisting of five (5) years commencing April 2, 2010 and ending on March 31, 2015, at midnight Eastern Standard Time, unless sooner terminated. All such Extension Term(s) shall be subject to the same terms and conditions as provided herein and as a condition to Licensee's right to exercise its extension options, Licensee must have met all its obligations as defined herein, including but not limited to, any financial terms as defined in Article 4, Article 5, and Article 6. Such options to extend the term of this Agreement must be exercised by Licensee, if at all, by giving written notice to Licensor at least sixty (60) days prior to the expiration of Initial Term or any Extension Term of this Agreement. Licensee agrees to allow Licensor to solicit other manufacturers for the same product sixty (60) days prior to the end the Initial Term or any Extension Term or upon notice given by the Licensee not to extend this Agreement for the purpose of researching the marketplace and being prepared to license its trademarks in the Territory in the event Licensee does not exercise its option to extend this Agreement.

**ARTICLE 4**
**EARNED ROYALTIES AND NET SALES**

4.1    Earned Royalties. Subject to Section 5.2 of Article 5 hereof, Licensee shall pay to Licensor for the rights granted hereunder (hereinafter called "Earned Royalties") during the Initial Term and each Extension Term (Royalty Periods) a sum equal to four percent (4%) of Net Sales for all Men's Licensed Products and six percent (6%) of Net Sales for all Women's and Children's Licensed Products. Anything herein contained to the contrary notwithstanding, Licensee, at the end of every selling season may, in its sole discretion, determine to sell off remaining inventory of the Licensed Items (hereinafter called ("Excess Inventory") from the previous season at a discount to those stores listed in Exhibit "D". Any Excess Inventory sold at a discount off of Net Sales in excess of 27-1/2% be it Men's, Children's or Women's Licensed Products, shall be subject to an Earned Royalty of two and one half percent (2.5%) of the Net Sales of such inventory. The Earned Royalties shall be remitted in accordance with Article 5.2 of this Agreement.

4.2    Definition of Net Sales. As used throughout this Agreement, the Term "Net Sales" shall mean the aggregate of the invoiced amounts of Licensed Items sold (as defined in Article 4.3 below) by Licensee, less the following items of expense to the extent they are paid or allowed and included in the aggregate prices shown on the actual invoices and in accordance with generally accepted accounting principles: (1) freight charges to customers; (2) sales, use or turnover taxes on sales invoices; (3) quantity trade discounts, (4) total credits for returned/defective Licensed Items; and (5) total credits for Excess Inventory sold as defined in 4.1 above. In no event may the total credit taken by Licensee for all discounts and returns taken during any Royalty Period exceed twelve   percent (12%) of the total gross sales of the Licensed Items in such Royalty Period. Licensee shall have the right to request discounts for additional credit issued to customers up to the twelve percent discount. Prior to the start of any Royalty Period, and if applicable, Licensee agrees to reduce the said twelve percent (12%) total credit to a level that is consistent with the average total credit percentage given on all discounts and returns during the previous Royalty Period. No credit will be permitted for cash or early payment discounts or allowances. No other costs incurred in the manufacturing, selling, advertising, and distribution of the Licensed Items shall be deducted nor shall any deduction be allowed for any uncorrectable accounts or allowances. If the Licensee makes any sales of the Licensed Items to a subsidiary, associated or affiliated company, or through any agency, then the price subject to royalty shall be that charged by Licensee's subsidiary, associated or affiliate company, agency, or that charged by Licensee, whichever is higher.

4.3    Definition of Sold. Licensed Items shall be deemed to have been "sold": (1) when transferred to an open sales account, whether delivered to the purchaser or to a third party for delivery to the purchaser; or (2) when paid for in advance of delivery; or (3) when billed out; whichever occurs first.

4.4    Licensor Purchases of Licensed Items. Upon the immediate release of the marketing and distribution of the Licensed Items, Licensee agrees to sell the Licensed Items to Licensor for their own use or for resale to their employees and distributor's employees and/or to its licensing agent, Leveraged Marketing Corporation of America, for their own use, at prices and terms which are lower than or equal to those same prices and terms charged and afforded by Licensee to its best wholesale customer. Royalties shall be payable on all such sales.

## ARTICLE 5
## GUARANTEED MINIMUM ROYALTIES AND ROYALTY PAYMENTS

5.1    Guaranteed Minimum Royalties.  Notwithstanding anything to the contrary set forth herein, Licensee shall pay to Licensor during the Initial Term a Guaranteed Minimum Royalty of $1,272,000.  Components by John McCoy, Inc. ("Components") will provide a financial guarantee of payment of Licensee's obligation to pay the Guaranteed Minimum Royalties to Mack for sale of the Licensed Items if this Agreement terminates prematurely during the Initial Term. In such case, payment of the financial guarantee shall be made immediately upon termination.  During the Initial Term the amount of the financial guarantee by Components shall not exceed $750,000. Until the Licensee has paid $522,000 in Guaranteed Minimum Royalties to Mack during the Initial Term, the $750,000 maximim guarantee by Components will not be reduced. Thereafter it shall reduce dollar for dollar as Guaranteed Minimum Royalties are subsequently paid to Mack during the Initial Term. The Guaranteed Minimum Royalties shall be payable as follows:

| Payment | Due Date |
|---------|----------|
| $15,000 | Upon Execution of Agreement |
| $50,000 | December 31, 2004 |
| $50,000 | March 31, 2005 |
| $144,625 | June 30, 2005 |
| $144,625 | September 30, 2005 |
| $144,625 | December 31, 2005 |
| $144,625 | March 31, 2006 |
| $144,625 | June 30, 2006 |
| $144,625 | September 30, 2006 |
| $144,625 | December 31, 2006 |
| $144,625 | March 31, 2007 |

For the three one-year Extension Terms, the Guaranteed Minimum Royalties shall be as indicated below and paid to Licensor in four equal quarterly installments with each installments due on or before June 30, September 30 and December 31, and March 31 of the then current Extension Term:

First Extension  $2,014,000
Second Extension $2,626,000
Third Extension  $3,138,000

For each year within the Fourth Extension Term (five years), the annual amount of Guaranteed Minimum Royalties shall be determined and agreed upon by both the Licensee and the Licensor. Such discussions shall begin no sooner than 18 months prior to the end of the Third Extension Term. The payment and due dates for the Fourth Extension Term Guaranteed Minimum Royalty shall also be divided in four equal quarterly installments with each installment paid to Licensor on or before June 30, September 30, December 31, and March 31, of each year within the Fourth Extension Term.

 5.2 Application of Earned Royalties in the Initial Term and Extension Terms. The Earned Royalties shall be accounted for quarterly during the Initial Term and any Extension Term and applied against the Guaranteed Minimum Royalties pursuant to the schedule specified in Section 5.1 above and any cumulative Earned Royalties for the applicable period in excess of the cumulative Guaranteed Minimum Royalties for the same period shall be paid by Licensee to Licensor no later than fifteen (15) days following the end of each quarter, starting with the quarter ending March 31, 2005.

 5.3 Royalty Periods. For the purpose of calculating and remitting any Guaranteed Minimum Royalty, Royalty Payments, and/or Earned Royalties to Licensor, each such Royalty Period as defined in Section 4.1 herein shall be deemed independent of all other periods, without calculations of rollovers and rollbacks.

## ARTICLE 6
## MINIMUM NET SALES OF LICENSED ITEMS

 6.1 Minimum Net Sales. Notwithstanding anything to the contrary set forth herein, Licensee shall maintain Minimum Net Sales during each Term as follows:

Initial Term      $31 Million
First Extension Term    $42.3 Million
Second Extension Term   $55.2 Million
Third Extension Term    $59.7 Million
Fourth Extension Term   To be determined

 6.2 Failure To Meet Required Minimum Net Sales and Guaranteed Minimum Royalties. Should Licensee fail to maintain at least 80% of the required Minimum Net Sales figures as provided in Section 6.1 during any two consecutive Terms or during any two consecutive years within the Fourth Extension Term, then Licensor may, at its option, elect to terminate this Agreement by written notice delivered to Licensee within one-hundred-twenty (120) days after the end of any Term in which Licensee failed to maintain such required Minimum Net Sales. Furthermore, Licensor may, at its option,

elect to terminate this Agreement if Licensee fails to pay Licensor the full required Guaranteed Minimum Royalties for any Term or fails to make timely Royalty Payments as outlined in Article 5. Such termination shall be effective pursuant to Articles 20 and Article 21 herein and such termination shall not affect Licensee's outstanding indebtedness to Licensor or any of the provisions relating thereto.

6.3    Failure to Meet Product Category Net Sales. Should Licensee fail to achieve a total aggregate amount of $8.4 million in Net Sales for Women's Apparel by March 31, 2007 or if Licensee fails to achieve a total aggregate amount of $4.48 million in Net Sales for Children's Apparel by March 31, 2007, Licensor shall have the option to revoke and terminate Licensee's rights in the respective category which failed to achieve said amount. Such termination shall be effective pursuant to Article 20 and Article 21 herein and such termination shall not affect Licensee's outstanding indebtedness to Licensor or any of the provisions relating thereto.

### ARTICLE 7
### ADVERTISING AND ART WORK

7.1    Advertising Expenditures. Licensee shall advertise and promote the Licensed Items throughout the entire Term of this Agreement. During the Initial Term and any Extension Term, Licensee agrees to spend an amount equal to at least 3% of the Minimum Net Sales as defined in Section 6.1 above for each Royalty Period.

7.2    Advance Submission. Licensee shall submit to Licensor for approval all advertising and promotional items, and materials relating to the Licensed Items at least twenty (20) business days prior to initial usage. Licensor shall provide Licensee with written approval or disapproval within ten (10) business days after Licensor's confirmed receipt thereof. If Licensee receives no response within a timely fashion, then the materials shall be deemed approved. Such approval shall not be unreasonably withheld. Should Licensor disapprove, its written notice shall explain in detail the reasons for disapproval so that Licensee may prepare and submit new advertising and art work.

7.3    Art Work. Licensor shall make available to Licensee any and all necessary film, photostats, artwork and full color reproductions of its Licensed Marks, artwork, designs and other materials necessary for Licensee's use in accordance with this Agreement.

7.4    Expense Reimbursement. Licensee shall reimburse Licensor for Licensor's out-of-pocket expenses, including reasonable hourly charges for creative work incurred by Licensor in the preparation for Licensee, when and if required, of new artwork, mechanicals, and film. All charges shall be agreed to prior to being incurred, and all sums due to Licensor under this Article 7 shall be paid by Licensee thirty (30) days after receipt of an appropriate invoice.

## ARTICLE 8
## LICENSEE'S RECORDS

8.1    Licensee shall keep and maintain at its regular place of business separate and complete books and records of all business transacted by Licensee in connection with the Licensed Items, including, but not limited to, books and records relating to Net Sales and orders for Licensed Items. Such books and records shall be maintained in accordance with generally accepted accounting procedures and principles consistently applied. Licensor or its duly authorized agents or representatives shall have the right on reasonable notice to inspect said books and records at Licensee's premises during Licensee's regular business hours no more than once a year.

## ARTICLE 9
## LICENSEE'S QUARTERLY REPORTS OF NET SALES AND ROYALTY PAYMENTS

9.1    On or before the fifteenth (15) day of each January, April, July and October during the Initial Term and any Extension Term, Licensee shall deliver to both Licensor and Leveraged Marketing Corporation of America as provided herein under Article 34 the following: (i) a written statement, certified to be true and correct by the Chief Financial Officer of Licensee, setting forth the monthly gross sales and Net Sales for each of the Licensed Items during the preceding calendar quarter and a calculation of the Earned Royalties payable under Articles 4 and 5 of this Agreement, and (ii) if applicable, a check payable to Licensor in full payment of the amount due under Articles 5.2 of this Agreement.

## ARTICLE 10
## WORK PRODUCT

10.1    Definition of Work Product. Work Product shall mean all artwork and other materials, and the ideas embodied therein incorporating the Licensed Marks, conceived under or resulting from work performed for and/or in connection with the Licensed Items under this Agreement, which includes copyrighted materials and Licensed Marks, trade names, service marks and service names, or the like, whether developed by Licensee or on behalf of Licensee.

10.2    Ownership of Work Product. All Work Product is the exclusive property of Licensor. Licensee shall be free to use such Work Product in any manner it chooses within the terms of this Agreement and without payment of further consideration. Licensee agrees to assign, transfer and set over to Licensor all right, title and interest in such Work Product whether now known or hereafter devised. Specifically, but not to limit the above, Licensee hereby assigns to Licensor, its successors and assigns worldwide exclusive ownership of and any right, title and interest in all copyright to such Work Product, recognizes such Work Product as "work for hire" if applicable under relevant copyrights or other laws, and will take all steps necessary to protect such copyrights on behalf of Licensor.

10.3   Work Product Releases. Licensee agrees to obtain releases or other agreements from its employees and/or independent contractors who develop such Work Product to ensure that the sole title to Work Product is vested in Licensor. Licensee agrees to procure the waiver of its employees and/or independent contractors to any moral rights to which they may be entitled in any Work Product.

10.4   Approval of Work Product. If Licensee desires to develop any different design for any mark, symbol, logo, character or other element included in the Licensed Marks, it shall first obtain Licensor's prior written approval. Any such design shall be included in the Licensed Marks licensed hereunder, provided Licensor shall own all the rights in such new design. All uses thereof shall inure to the exclusive benefit of Licensor. Licensor may register and protect the same in its own name as it sees fit.

## ARTICLE 11
## AUDIT BY LICENSOR

11.1   At all times upon reasonable notice and not more than once every twelve (12) months during the existence of this Agreement and for twelve (12) months after the last report is rendered hereunder, Licensor shall have the right to audit all books and records of Licensee with respect to the Licensed Items. Licensor shall have the further right to engage an independent certified public accounting firm, to audit the books and records of Licensee with regards to the Earned Royalties due hereunder. In the event any such audit shall disclose that the Licensee has understated Net Sales or underpaid Earned Royalties for any reporting period, Licensee shall forthwith and upon written demand of Licensor, pay the amount, if any, by which the Earned Royalties owing exceed Earned Royalties paid, plus interest of the then current prime interest rate percentage plus five (5%) percent per annum but in no event in excess of fifteen (15%) percent per annum on such delinquent amounts, accruing from the date on which such amounts became delinquent to the date on which such delinquent amounts were paid. In the event that Licensee has understated Net Sales and consequently has underpaid Earned Royalties in excess of [five percent (5%)] of amount due during the Initial Term or any Extension Term, Licensee shall forthwith and upon written demand also pay all reasonable costs, fees and expenses incurred by Licensor in conducting such audit, including, without limitation, reasonable travel expenses. Should such audit disclose that the Earned Royalties paid exceed the Earned Royalties due, any excess revealed by such audit will be remitted to Licensee upon written demand by Licensee.

## ARTICLE 12
## LICENSEE OBLIGATIONS

12.1   Licensee Diligence. Licensee shall design, manufacture, advertise, sell and distribute the Licensed Items and, shall be responsible for whatever warranty and service obligations may apply to the Licensed Items. During the Term hereof Licensee

shall continuously and diligently procure and maintain facilities and trained personnel sufficient and adequate to accomplish the foregoing, all to the extent and in a manner no less thorough, diligent and professional than the same accorded by Licensee for Licensee's most favored premium products and/or services. After written notice by Licensor to Licensee, a cessation of the above for a continuous period of ninety (90) days shall be grounds for termination by Licensor, without further notice.

12.2   Licensor Inspection Rights. Licensor shall have the right to inspect any of Licensee's facilities pertaining to the Licensed Items during regular business hours. Licensee may provide an officer, partner or authorized representative of Licensee to accompany Licensor during such inspection.

## ARTICLE 13
## APPROVALS AND QUALITY STANDARDS

13.1   Advance Approval. Prior to any use of any Licensed Marks, Licensee shall, at Licensee's expense, submit to Licensor, for Licensor's written approval, the following: (a) two (2) specimens of each Licensed Item on which said Licensed Marks are to appear (the "Specimens"); (b) all artwork which Licensee intends to use on the Licensed Items incorporating the Licensed Marks in connection with the Licensed Marks; and (c) all packaging, advertising and promotional literature utilizing the Licensed Marks which Licensee or any third party intends to use in the marketing or merchandising of the Licensed Items. Licensor shall give Licensee written notice of approval or disapproval within twenty (20) business days from its confirmed receipt of the Specimens, and should Licensor disapprove, its written notice shall explain in detail the reasons for disapproval so that Licensee may prepare and submit new Specimens. If no written notice of approval or disapproval is received by Licensee within such twenty (20) business day period, approval shall be deemed given.

13.2   Standards. After Licensor has given its written approval of said Specimens, then the approved Specimens of the product, quality, packaging, advertising and promotional literature shall be the quality and use standards for all Licensed Items produced thereafter (the "Approved Quality Standards").

13.3   Periodic Specimens. Thereafter, Licensee shall, at Licensee's expense, submit to Licensor no more than one time per year and at the written request of Licensor one (1) each of a randomly selected production run Specimens of the Licensed Items. If the Specimens materially deviates from the Approved Quality Standards as defined above in 13.2, Licensor shall send written notice to Licensee of such deviations and Licensee shall remedy the situation within 30 days as outlined in 19.1 herein.

13.4   Approved Quality Standards. Without the prior written approval of Licensor, Licensee shall not sell or distribute any Licensed Item which materially deviates from the Approved Quality Standards.

## ARTICLE 14
## RESTRICTIONS UPON SUBCONTRACTS

14.1    Licensee shall not enter into subcontracts for the manufacture of Licensed Items without the express written consent of Licensor. Such consent shall not be unreasonably withheld. Licensee is responsible for the work of any subcontractor and for any debts, obligations or liabilities incurred by any such subcontractor in connection with the Licensed Items.] In the event any subcontractor defaults in the performance of any of the terms, conditions or obligations to be performed by said subcontractor, and if such non-compliance is not cured thirty (30) days after subcontractor receives written notice from Licensee of such default or if Licensor gives such 30-days written notice to Licensee of such default, then Licensee shall, immediately upon the expiration of such 30 days notice period, discontinue using said subcontractor.    Further, Licensee and if applicable, its subcontractors, shall always produce the Licensed Items in a manufacturing environment which respects human rights.


## ARTICLE 15
## ASSIGNMENT; TRANSFERS; SUBLICENSE

15.1    The parties hereby acknowledge the substantial personal service nature of Licensee's obligations hereunder. Therefore, without Licensor's prior written consent, not to be unreasonably withheld, Licensee shall not voluntarily or by operation of law assign or transfer this Agreement or any of Licensee's rights or duties hereunder or any interest of Licensee herein, nor shall Licensee enter into any sublicense for the use of the Licensed Marks by others.

15.2    Licensee agrees that any assignment, delegation, transfer or sub-license of this Agreement without Licensor's written consent shall be void and at the option of the Licensor shall constitute a default hereunder. For purposes of this Article 15, the transfer in one or more transactions, by operation of law or otherwise, of 50% or more of the outstanding voting securities of Licensee shall be deemed an assignment by the Licensee of this Agreement.

## ARTICLE 16
## NO DILUTION OF LICENSED MARKS OR ATTACK UPON LICENSED MARKS

16.1    Limit on Use. Licensee shall not at any time use, promote, advertise, display or otherwise publish any of the Licensed Marks or any material utilizing or reproducing any of the Licensed Marks in whole or in part, except as specifically provided in this Agreement.

16.2    Notice. Licensee shall cause to appear on all Licensed Items and on all materials on which, or in connection with which, any of the Licensed Marks are used, such legends, markings and notices as may be required by law to give appropriate notice of all Licensed Marks, trade names or other rights therein or pertaining thereto.

16.3   Materials and Documents. Licensee shall provide all materials and execute all documents required by law incidental to the maintenance and/or preservation of the Licensed Marks and Licensor's rights therein. This shall include all documents and information required to record this Agreement with government authorities where required or deemed advisable by Licensor in its sole discretion.

16.4   No Contest of Trademark Validity. Licensee shall not contest the validity of the Licensed Marks or any rights of Licensor therein, nor shall Licensee willingly become an adverse party in litigation in which others shall contest the Licensed Marks or Licensor's therein rights. In addition, Licensee shall not seek to avoid its obligations hereunder because of the assertion or allegation by any persons, entities or government agencies, bureaus, or instrumentalities that the Licensed Marks, or any of them, are invalid or ineffective by reason of any contest concerning the rights of Licensor therein.

16.5   No Other Trademark Protection. Licensee agrees not to seek any state, Federal, foreign or other statutory trademark or service mark registration or other protection for the Licensed Marks as they are used in connection with the Licensee's goods or services and agrees that the use of the Licensed Marks shall be for the sole benefit of the Licensor.

## ARTICLE 17
## INFRINGEMENT AND OTHER TRADEMARK LITIGATION

17.1   Trademark Defense. Licensee shall apprise Licensor immediately upon discovery of any possible infringement of the Licensed Marks which comes to the attention of the Licensee. Licensor, at its sole cost and expense, and in its own name, may prosecute and defend any action or proceeding which Licensor deems necessary or desirable to protect the Licensed Marks, including but not limited to actions or proceedings involving their infringement. Upon written request by Licensor, Licensee shall join Licensor at Licensor's sole expense in any such action or proceeding. However, Licensee shall not commence any action or proceeding to protect the Licensed Marks or any action or proceeding alleging infringement thereof without the prior written consent of Licensor. Licensee may prosecute and defend, at its sole expense and in its own name, any action or proceeding to protect its designs or styles. Any and all damages recovered in any action or proceeding commenced by Licensor shall belong solely and exclusively to Licensor.

17.2   No Liability for Violation. Licensor shall have no liability to Licensee or any other person, nor shall be there by any right of contribution against Licensor therefore, for any action or proceeding alleging any violation of any antitrust, trade regulation, or similar statute, or unfair competition unless solely and proximately caused by an act of Licensor. Furthermore, in the event of any threatened or actual action or proceeding in which Licensee and Licensor are or may be charged with jointly violating any antitrust, trade regulation or similar statute, or any law pertaining to unfair competition, Licensee

may, at its option, elect to be represented in such threatened or actual action or proceeding by Licensor's counsel at no cost to Licensee for fees, costs or expenses.

Should Licensee elect in such event to be represented by Licensor's counsel, then Licensee shall relinquish any right to control or direct such threatened or actual action or proceeding, and Licensor shall maintain full control thereof. Such representation of Licensee shall continue only so long as Licensor's counsel, in its sole and absolute discretion, believes that it may properly and ethically represent both Licensor and Licensee. In the event that Licensor's counsel decides that it may no longer properly and ethically represent both Licensor and Licensee, then Licensor's counsel shall continue to represent Licensor only, and Licensee's continued defense shall be at Licensee's sole expense and shall be conducted by separate counsel.

17.3   Licensee Indemnification. Licensee shall indemnify and hold Licensor harmless including attorneys fees, from any and all trademark or infringement liability and/or claims for which Licensor shall become liable by reason of any actions that may be committed by Licensee in connection with Licensee's improper and/or unauthorized use of the Licensed Marks or any other Mack trademark.

17.4   Licensor Indemnification. Licensor hereby indemnifies and holds Licensee harmless from any loss, cost or judgment Licensee may incur by virtue of Licensee's use of the Licensed Marks in accordance with this Agreement, provided that such loss, cost or judgment shall be directly and proximately caused by a defect or other inadequacy in Licensor's intellectual property rights to the Licensed Marks herein. This indemnity and hold harmless provision shall not apply to and in no event shall Licensor be directly or indirectly liable for special, indirect, incidental and/or consequential damages, whether in contract, tort, or negligence.

17.5   Limitation on Rights. Licensee shall have no rights against Licensor with respect to any of the matters covered in this Article 17 except as expressly set forth above. Licensee shall under no circumstance incur legal expense on Licensor's account absent prior specific written authorization from Licensor.

17.6   Equitable Relief. Licensee admits and agrees that the Licensed Marks are well known and recognized by the general public and associated in the public mind with Licensor and that they possess special, unique and extraordinary characteristics which make difficult the assessment of the monetary damage which Licensor would sustain by unauthorized use of the Licensed Marks. Licensee further admits and agrees that immediate and irreparable harm would be caused to Licensor by any unauthorized use of the Licensed Marks and that Licensor would have no adequate remedy at law. Therefore, Licensee admits and agrees that injunctive and other equitable relief would be appropriate and necessary in the event of a breach of this Agreement by Licensee.

## ARTICLE 18
## ADDITIONAL RESTRICTIONS UPON USE OF LICENSED MARKS

18.1   Identification of Licensed Items. It is the intention of the parties hereto and the purpose of this Article 18 that all of the Licensed Items be identified to the general public by the Licensed Marks. Licensee agrees to use a registration indicator in the form of a circled-R or symbol in conjunction with registered Licensed Marks or TM in conjunction with unregistered Licensed Marks when so instructed by the Licensor. Licensee further agrees to assist Licensor in obtaining registrations for the Licensed Marks in the event the Licensed Marks are not yet registered for the Licensed Items. Licensee agrees to use notice language in the manufacture, sale, advertising or other promotion of the Licensed Items as follows: "MACK, Mack and the Bulldog Design Oval Logo and Built Like A Mack Truck are Registered Trademarks of Mack Trucks, Inc. All rights reserved" or other such language as Licensor designates in writing.

## ARTICLE 19
## DEFAULTS BY LICENSEE

19.1   Defaults. Except as otherwise expressly provided in this Agreement, in the event Licensee shall default in the performance of any of the terms, conditions or obligations to be performed by Licensee hereunder, and if such default involves the payment of money and is not cured within ten (10) days of such default, or if such default involves performance other than the payment of money and the same is not cured thirty (30) days after Licensor gives written notice to Licensee of such default, then, and in any such event, Licensor may immediately and without prior notice terminate this Agreement and all of the rights and obligations hereunder (except as otherwise expressly provided by this Agreement). In the event that a Receiver is appointed to, or one or more creditors take possession of all, or substantially all, of the assets of the Licensee, or if Licensee shall make a general assignment for the benefit of creditors, or if any action is taken or suffered by Licensee under any state insolvency act or a proceeding is commenced under Title 11 of the United States Code against Licensee, then this Agreement and all of the rights and obligations hereunder (except as otherwise expressly provided by this Agreement) shall immediately, and without notice or need of any further action by any party hereto, terminate.

19.2   Time for Performance. The time for performance of any act required of either party shall be extended by a period equal to the period during which such party was reasonably prevented from performance by fire, flood, storm, or other like casualty beyond such party's control.

19.3   Acceleration of Earned and Minimum Royalties. In the event this Agreement is terminated by Licensor due to a breach by Licensee, then all Earned Royalties and Guaranteed Minimum Royalties for the remainder of the Royalty Period in which the termination occurs shall be paid to Licensor per the schedule as outlined in Paragraph 5.1, without prejudice to any other rights or remedies which Licensor may have in law or in equity.

14

## ARTICLE 20
## LICENSOR'S RIGHTS TO DESIGNS, ETC., UPON TERMINATION

20.1   Rights Upon Termination. In the event this Agreement is terminated pursuant to Article 9 or if any portion of this Agreement is terminated pursuant to Sections 6.2 and 6.3 herein, or if this Agreement expires according to its terms, Licensee recognizes and acknowledges that it no longer enjoys the permission granted in this Agreement to use the Licensed Marks in accordance with the terms of said Agreement. If, however Licensee has acquired any rights in the Licensed Marks through its use pursuant to this Agreement, Licensee agrees to promptly abandon, release and/or transfer to Licensor such rights upon termination of this Agreement. Licensee may, however, dispose of its stock of Licensed Items on hand within one hundred twenty (120) days after the termination of this Agreement; provided, however, that all sums due to Licensor have first been paid; and, further provided, that Licensee shall, prior to the effective date of said termination, deliver to Licensor a detailed schedule of all inventory of Licensed Items in Licensee's possession (constructive or otherwise). After the expiration of the aforesaid 120 day period, Licensee shall destroy all Licensed Items and packaging and promotional material remaining in Licensee's possession which are identified in any manner by or with the Licensed Marks. It is specifically understood and agreed that the Licensee's right to dispose of stock shall be conditioned upon the absence of harm to the Licensed Marks and/or the reputation of the Licensor arising from the Licensee's use of the Licensed Marks, as reasonably determined by the Licensor.

20.2   Continuation of Agreement Terms. Licensee shall continue to abide by the terms of this Agreement with respect to such Licensed Items during the period in which disposition of its stock of Licensed Items pursuant to Article 20.1 of this Agreement is taking place. Neither Licensee nor any creditor (judgment or otherwise), assignee, transferee, trustee, or receiver of Licensee, or similar person or officer, or purchaser other than in the regular course of Licensee's business may sell or transfer any Licensed Item until and unless all sums due Licensor from Licensee have been paid. Further, upon termination of this Agreement, all labels, signs, packages, wrappers, cartons, circulars, advertisements, and other items bearing or containing any reproduction or representation of any of the Licensed Marks shall immediately be destroyed by Licensee or, if requested in writing by Licensor prior to the termination of this Agreement, be delivered to Licensor's place of business or other location designated by Licensor and to be destroyed. The reasonable cost of such delivery shall be paid by the Licensor.

20.3   Licensee's Obligations. The termination of this Agreement for any reason shall not relieve Licensee of any accrued obligations to Licensor nor shall such action relieve Licensee of any obligation or duty which accrued on or after the termination or expiration of this Agreement.

20.4   No Right in Licensee. It is understood and agreed that except for the right to use the Licensed Marks as specifically provided for in this Agreement, Licensee shall

have no right, title or interest in or to the Licensed Marks. Upon and after the termination of this Agreement, all rights granted to Licensee hereunder, together with any interest in and to the Licensed Marks that Licensee may acquire, shall forthwith and without further act or instrument be assigned to and revert to the Licensor. In addition, Licensee shall execute any instruments requested by Licensor to accomplish or confirm the foregoing. Any such assignment, transfer or conveyance shall be without consideration other than the mutual agreements contained herein.

20.5   Survival of Terms. The provisions of this Article 20 shall survive the termination (or expiration) of this Agreement.

## ARTICLE 21
## ADDITIONAL RIGHTS PRIOR TO TERMINATION

21.1   During the final year of the Initial Term or any Extension Term if not extended as hereinabove set forth, or if this Agreement is terminated for any reason, Licensor shall have the right to design and manufacture merchandise of the types covered by this Agreement and/or to negotiate and conclude such license agreements as it desires pursuant to which it may grant licenses to any party or parties of any or all of the rights herein granted to Licensee; provided, however, that no merchandise herein identified as Licensed Items shall be shipped by Licensor or any third party other than Licensee prior to the expiration or termination of this Agreement (exclusive of the additional one hundred twenty (120) day period for the disposition of the Licensed Items as provided in Article 20 hereof).

## ARTICLE 22
## GOODWILL

22.1   Licensee acknowledges and recognizes that the Licensed Marks are of substantial significance and value to Licensor and that said Licensed Marks have acquired valuable secondary meaning, value and goodwill. Except as may be otherwise specified in this Agreement, Licensee shall not use any of the Licensed Marks or any name or symbol similar thereto as part of its name or symbol or as part of the name or symbol of any corporation, partnership, joint venture, proprietorship or other entity or person which it controls or with which it is affiliated.

## ARTICLE 23
## INSURANCE

23.1   Insurance Coverage. This Agreement shall not make Licensee an agent of Licensor for any purpose. Licensee agrees to comply with all applicable local and state, and federal laws and regulations relating to the Licensed Marks and the Licensed Items manufactured and sold hereunder, and to indemnify and hold Licensor harmless from

any loss, cost, or judgment Licensor may incur by virtue of Licensee's manufacture, marketing, sales, and/or distribution of the Licensed Items or use of the Licensed Marks hereunder, except as solely caused by act or omission of Licensor. Licensee shall maintain the following insurance coverage at all times while this Agreement is in effect including any sell-off period following the expiration or early termination of this Agreement for any claim which arises because of the grant of the License under this Agreement. Such insurance shall name Licensor as an additional named insured with respect to claims arising out of this Agreement, and shall include coverage for contractual liability assumed under this Agreement:

A. "Primary commercial general liability insurance, including products and
   completed operations, with limits no less than:

| | |
|---|---|
| General Aggregate: | $2,000,000 |
| Products & Completed Operations Aggregate: | $2,000,000 |
| Personal & Advertising Injury: | $1,000,000 |
| Each Occurrence: | $1,000,000 |

B. Commercial Umbrella Limits not less than:

| | |
|---|---|
| Aggregate: | $5,000,000 |

| | |
|---|---|
| C. Business Auto: | $1,000,000 |
| Workers Compensation: | Statutory with General liability limits of |

D.    Licensee hereby agrees that it shall require that its insurer, pursuant to the terms and conditions of any insurance policy, shall waive any and all subrogation rights it may acquire against Licensor as a result of the payment of any claim against Licensee.

E.    This coverage is to be written by an insurance company with a Bests' rating of A or better, size VII or higher.

    23.2    Certificate of Insurance. Licensee shall procure and provide to Licensor a certificate of insurance executed by the insurance company (or companies) providing such insurance. The parties agree that any change in or the cancellation of any policies under which certificates are issued shall not be valid with respect to Licensor's interest therein until Licensor has had thirty (30) days prior written notice of such change or cancellation.

## ARTICLE 24
## AGENTS, FINDERS AND BROKERS

24.1   Each of the parties to this Agreement shall be responsible for the payment of any and all agent, brokerage and/or finder commissions, fees and related expenses incurred by it in connection with this Agreement or the transactions contemplated hereby and agrees to indemnify the other and hold it harmless from any and all liability (including, without limitation, reasonable attorney's fees and disbursements paid or incurred in connection with any such liability) for any agent, brokerage and/or finder commissions, fees and related expenses claimed by its agent, broker or finder, if any, in connection with this Agreement or the transactions contemplated hereby. Licensor's sole agent/finder/broker in connection with this Agreement is Leveraged Marketing Corporation of America ("LMCA") with offices at 156 West 56th Street, New York, New York 10019. Any and all commissions, fees and/or other monies due LMCA in connection with this Agreement shall be borne exclusively by Licensor as per the Agency Agreement of March 1, 1998 and subsequently amended on April 2, 2000.

## ARTICLE 25
## RESERVED RIGHTS

25.1   Rights not herein specifically granted to Licensee are reserved by Licensor and may be used by Licensor without limitation. Any use by Licensor of such reserved rights, including but not limited to the use or authorization of the use of the Licensed Marks in any manner whatsoever not inconsistent with Licensee's right hereunder, shall not be deemed to be interference with or infringement of any of Licensee's rights.

## ARTICLE 26
## APPLICABLE LAW

26.1   This Agreement shall be construed and governed, in all respects, by the laws of the Commonwealth of Pennsylvania applicable to contracts made and to be performed in that state without reference to any provisions relating to conflicts of law. Any legal action or proceeding of any sort against Licensor by or on behalf of Licensee, shall be brought in a court of competent jurisdiction in Allentown, Pennsylvania or the United States District Court for the Eastern District of Pennsylvania .

## ARTICLE 27
## NON-AGENCY OF PARTIES

27.1   This Agreement does not constitute or appoint Licensee as the agent or legal representative of Licensor, or Licensor as the agent or legal representative of Licensee, for any purpose whatsoever. Licensee is not granted any right or authority to assume or to create any obligation or responsibility, express or implied, on behalf of or

in the name of, Licensor or to bind Licensor in any manner or thing whatsoever; nor is Licensor granted any right or authority to assume or create any obligation or responsibility, express or implied, on behalf of or in the name of Licensee, or to bind Licensee in any manner or thing whatsoever. No joint venture or partnership between the parties hereto is intended or shall be inferred.

## ARTICLE 28
## AMENDMENTS AND WAIVERS

28.1   This Agreement may be amended or modified as mutually agreed to by Licensor and Licensee, and Licensor may waive any of its rights hereunder or performance by Licensee of any of its obligations hereunder, but only by instrument in writing. In the event Licensor shall at any time waive in writing any of its rights under this Agreement or the performance by Licensee of any of its obligations hereunder, such waiver shall not be construed as a continuing waiver of the same rights or obligations, or a waiver of any other rights or obligations.

## ARTICLE 29
## ENTIRE AGREEMENT

29.1   This Agreement constitutes the entire Agreement between the parties as to the Licensed Items, and supersedes all prior agreements and understandings relating to this subject matter hereof.

## ARTICLE 30
## SEPARABILITY OF PROVISIONS

30.1   If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future laws, such provisions shall be fully severable. The Agreement shall be construed and enforced as if such illegal, invalid or unenforceable provisions had never comprised a part of this Agreement, and the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid, or unenforceable provision or by its severance from this Agreement. Furthermore, in lieu of such illegal, invalid or unenforceable provision, there shall be added automatically as part of this Agreement, a provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible and be legal, valid or enforceable.

## ARTICLE 31
## COUNTERPARTS AND HEADINGS

31.1   This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument. The headings herein are set out for convenience of reference only and shall not be deemed a part of this Agreement.

## ARTICLE 32
## BINDING EFFECT

32.1   This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and, subject to the provisions of Article 15 of this Agreement, their respective permitted successors and assigns.

## ARTICLE 33
## INDEMNIFICATION BY LICENSEE

33.1   Indemnified Parties; Basic Indemnification. For purposes of this paragraph, "Indemnified Parties" refers to Licensor, and other licensees (not including Licensee) of rights relating to the Licensed Marks, and officers, directors, employees, and agents of each of the foregoing, and persons connected with or employed by them and each of them. Licensee hereby agrees that it shall indemnify and hold harmless the Indemnified Parties and each of them from and against the costs and expenses (including, without limitation, reasonable attorneys fees and costs) of any and all claims, suits, losses, damages, costs, demands, obligations, investigations, causes of action, and judgments arising out of:

(a) the unauthorized use in connection with, or arising out of, a Licensed Item of any trademark (including, without limitation, the Licensed Marks), patent, process, method or device;

(b) the infringement in such connection of any copyrights, trade name or patent or any act held to constitute libel, slander or defamation;

(c) the invasion of the right of privacy, publicity, or other property right;

(d) the failure to perform of, or any defect in, or use of, the Licensed Items, including without limitation any injuries to the person or to property arising therefrom;

(e) the infringement or breach of other personal or property right of any person, firm or corporation by Licensee, its officers, employees, agents, or anyone directly or indirectly acting by, through, on behalf of, or pursuant to contractual or any other relationship with Licensee; and

(f) Licensee's sales and/or promotional efforts.

(g) Licensee also agrees to be responsible for and pay any and all taxes, levies, and fees as may be required in those countries where the Licensee is domiciled, located and/or does business in connection with the terms of this Agreement, and Licensee shall indemnify Licensor for any penalties, fines, or fees levied as a result of Licensee's failure to make such payments and/or comply with the local tax rules and regulations or laws.

33.2   Indemnification for Breach. Licensee hereby further agrees that it shall indemnify and forever hold harmless the Indemnified Parties against and from any and all claims, suits, losses, damages, costs, obligations, liabilities, judgments, damages and expenses, including without limitation, reasonable attorneys' fees arising out of breach or alleged breach by Licensee of any provision of this Agreement, or any misrepresentation made by Licensee herein or any act not expressly authorized herein. Licensee further agrees that it shall indemnify and forever hold harmless the Indemnified Parties from any and all product liability claims arising from the use or misuse of the Licensed Items.

33.3   Survival of Terms. The provisions of this Article 33 shall survive the termination (or expiration) of this Agreement.

## ARTICLE 34
## ADDRESSES FOR NOTICE

34.1   All notices, statements, consents, instructions or other documents required or authorized to be given hereunder shall be in writing, and shall be delivered personally to an officer, partner or authorized representative of the other party or by certified mail, return receipt requested, addressed to the parties concerned as follows:

to Licensee at:

Johnny M LLC, Attn: John Mc Coy II, President, 20 West 55th Street, New York, NY 10019

With a copy to:  Todtman, Nachamie, Spizz & Johns, P.C., Attention: Barton Nachamie, Esq., 425 Park Avenue, New York, NY  10022

and to Licensor at:

Mack Trucks, Inc., Attn: Randy DeLillo, Manager-Corporate Stores & Licensing, 2100 Mack Blvd., Allentown, PA 18103

and to
Leveraged Marketing Corporation of America, Attn: Mr. Allan R. Feldman, 156 West 56th Street, New York, New York 10019

and shall be deemed to have been given upon receipt.

IN WITNESS WHEREOF, the parties, each intending to be legally bound, have caused this Agreement to be executed by their duly authorized representatives.

Mack Trucks, Inc. (Licensor)

By: Paul L. Vikner
    President, CEO

Date: 5/10/04

Attest:

By: Terrence C. Grube
    Corporate Secretary

Date: 5-13-04

Johnny M LLC (Licensee)

By: John Mc Coy II
    President

Date: 4/30/04

Attest:

By:

Date: 4/30/04

22

Exhibit "A"

<u>Licensed Marks</u>

1. Built Like A Mack Truck

2. Mack and the Bulldog design Oval Logo

3. Bulldog Design

4. Bulldog Tough

5. Bulldog Basics

6. MACK

Exhibit "B"

Men's Women's and Children's Apparel

Bottoms

Woven tops

Polos

Knitwear

Sweaters

Fleece

Outerwear

Jeanswear

Sweatshirts

Headwear

Socks

Underwear

T-shirts

Bags

Cloth Bags

Leather Bags

Back Packs

Exhibit "C"

### List of Approved Mid-Market Retailers

Saks Inc.

J.C.Penny

Kohl's

Goody's

Mervyn's

Navy Exchange

Army/Air Force Exchange

Stage Stores Inc.

May Co.

Dillard's

Federated

Pac-Sun

Gadzooks

Buckle

Farm Implement Stores

Underground

Fashion Urban Specialty Retailers

Dr. J's

Jimmy Jazz

City Blues

Locker Room

Demo

Hang Up Shops

Foot Locker

Finish Line

Garth Sports/Sports Authority

## Exhibit "D"

### List of Approved Retailers for Distribution for Excess Inventory

Burlington

T.J. Maxx/Marshals

Ross Stores

Century 21

EXHIBIT "B"

# TODTMAN, NACHAMIE, SPIZZ & JOHNS, P.C.

### 425 PARK AVENUE
### NEW YORK, NEW YORK 10022

MARTIN TODTMAN
BARTON NACHAMIE
ALEX SPIZZ
PETER A. JOHNS*
ROBERT D. TOLZ
ARTHUR GOLDSTEIN
PERRY L. COHEN
MATHEW E. HOFFMAN
SCOTT S. MARKOWITZ
IVAN SERCHUK
ROBERT A. RUBENFELD
PAUL RICHARD KARAN

———

COUNSEL

FELIPE MONTEJO
RICHARD S. CIACCI

———

OF COUNSEL

HARVEY I. SLADKUS
CARLO MACCALLINI**

*ADMITTED IN PARIS ONLY
**ADMITTED IN ITALY ONLY

TELEPHONE: (212) 754-9400
FACSIMILE:  (212) 754-6262
E-MAIL:   info@tnsj-law.com

3, RUE DU FAUBOURG SAINT-HONORÉ
75008 PARIS, FRANCE

———

VIA CESARE CANTÙ, N.1
20123, MILANO, ITALY

———

Sender's e-mail address:
bnachamie@tnsj-law.com

October 10, 2005

### _VIA E-MAIL (randy.delillo@macktrucks.com)_

Mr. Randy DeLillo
General Manager – Licensing
  & Merchandising
Mack Trucks, Inc.
2100 Mack Truck Blvd.
Allentown, PA  18103

          Re:    Johnny M. LLC

Dear Randy:

          This letter shall serve to confirm our several conversations concerning Johnny M. LLC and its obligations under that certain Trademark License Agreement dated April 2, 2004.

          Unfortunately, our client has advised us that it must close its doors.  The current retail climate, tied with all of the other events and circumstances I discussed with you on the telephone, have made it impossible for our client to continue.   Unfortunately, our client does not have the funds, or the income, to meet even Guaranteed Minimum Royalties as provided for under the Agreement.

          Our client has advised me that they have advised Success Apparel, Inc. of this fact and have directed Success Apparel to make all future payments under the Sublicense Agreement directly to Mack Trucks.   I would hope by this time you have received their September 30th payment.

          I will assume you will want some formal documentation concerning the termination and the directions to Success Apparel to make all future payments directly to Mack and the fact



205166.1

**TODTMAN, NACHAMIE, SPIZZ & JOHNS, P.C.**

Mr. Randy DeLillo
October 10, 2005
Page 2

that Johnny M will be ceasing operations.   I will be pleased to discuss any such documents with you and/or your company counsel.

In our conversations, you indicated to me you believed that you held the guaranty of Components By John McCoy, Inc. for a portion of the unpaid Guaranteed Minimum Royalties. I know of no document signed by that corporation binding them to such an agreement. I will be more than pleased to discuss this matter with your counsel and I hope that we can resolve this question shortly and in a peaceful, non-confrontational manner.

Thank you for your courtesies and cooperation in the past.   I am just sorry that this matter has reached this point.   As you know, our client has struggled with the Guaranteed Minimum Royalties and made all the prior payments that were scheduled.

I look to hear from you.

Yours very truly,


**s/Barton Nachamie**


Barton Nachamie

BN:bfg

205166.1

EXHIBIT "C"

COMPONENTS BY JOHN MCCOY, INC.                                          3119

| REFERENCE NO. | DESCRIPTION | INVOICE DATE | INVOICE AMOUNT | DISCOUNT TAKEN | AMOUNT PAID |
|---|---|---|---|---|---|
| | ROYALTY EXPENSE MACK | | | | 15,000.00 |

362601

| CHECK DATE | CHECK NO. | PAYEE | DISCOUNTS TAKEN | CHECK AMOUNT |
|---|---|---|---|---|
| 4/30/04 | 3119 | MACK TRUCK | | $15,000.0 |

**COMPONENTS BY JOHN MCCOY, INC.**
20 WEST 55TH STREET, PENTHOUSE
NEW YORK, NY 10019

250-3576000004-INC

JPMORGAN CHASE BANK
NEW YORK, NY 10019
1-2/210

3119

| CHECK NO. | DATE | AMOUNT |
|---|---|---|
| 3119 | Apr 30, 2004 | ***$15,000.00 |

Memo:   ROYALTY

PAY
TO THE    Fifteen Thousand and 00/100 Dollars
ORDER    · MACK TRUCK
OF:

J Mc Coy

AUTHORIZED SIGNATURE

SECURITY FEATURES INCLUDED. DETAILS ON BACK.

⑈003119⑈ ⑆021000021⑆01308241486 5⑈

COMPONENTS BY JOHN MCCOY, INC.

4317

| REFERENCE | DESCRIPTION | INVOICE DATE | INVOICE AMOUNT | DISCOUNT TAKEN | AMOUNT PAID |
|---|---|---|---|---|---|
| | ROYALTY EXPENSE MACK | | | | 50,000.00 |

2ND Pym't on Initial Term

MKSHOP / 362601

| CHECK DATE | CHECK NO. | PAYEE | DISCOUNT TAKEN | CHECK AMOUNT |
|---|---|---|---|---|
| 1/17/05 | 4317 | MACK TRUCK | | $50,000.00 |

**COMPONENTS BY JOHN MCCOY, INC.**
20 WEST 55TH STREET, PENTHOUSE
NEW YORK, NY 10019

JPMORGAN CHASE BANK
NEW YORK, NY 10019
1-2/210

4317

| CHECK NO. | DATE | AMOUNT |
|---|---|---|
| 4317 | Jan 17, 2005 | ***$50,000.00 |

Memo:  ROYALTY CHECK

PAY
TO THE  Fifty Thousand and 00/100 Dollars
ORDER
OF:  MACK TRUCK

AUTHORIZED SIGNATURE

⑆ SECURITY FEATURES INCLUDED. DETAILS ON BACK ⑆

⑆004317⑆  ⑆021000021⑆01308241486 5⑆

COMPONENTS BY JOHN MCCOY, INC.                                                                4765

| REFERENCE NO. | DESCRIPTION | INVOICE DATE | INVOICE AMOUNT | DISCOUNT TAKEN | AMOUNT PAID |
|---|---|---|---|---|---|
| | ROYALTY EXPENSE MACK | | | | 50,000.00 |

3rd installment in initial term of license Agreement

MKSHOP/362601

| CHECK DATE | CHECK NO. | PAYEE | DISCOUNTS TAKEN | CHECK AMOUNT |
|---|---|---|---|---|
| 4/4/05 | 4765 | MACK TRUCK | | $50,000.00 |

MKSHOP/362601

COMPONENTS BY JOHN MCCOY, INC.
20 WEST 55TH STREET, PENTHOUSE
NEW YORK, NY 10019

JPMORGAN CHASE BANK
NEW YORK, NY 10019
1-2/210

4765

|  | CHECK NO. | DATE | AMOUNT |
|---|---|---|---|
| | 4765 | Apr 4, 2005 | ***$50,000.00 |

Memo:   ROYALTY

PAY   Fifty Thousand and 00/100 Dollars
TO THE
ORDER   MACK TRUCK
OF:

AUTHORIZED SIGNATURE

MP

ⓐ SECURITY FEATURES INCLUDED. DETAILS ON BACK. ⓐ

⑆004765⑆ ⑆021000021⑆0130824148565⑆

| REFERENCE NO. | DESCRIPTION | INVOICE DATE | INVOICE AMOUNT | DISCOUNT TAKEN | AMOUNT PAID |
|---|---|---|---|---|---|
| | ROYALTY EXPENSE MACK | | | | 144,000.00 |

*MK SHOP / 362601*

| CHECK DATE | CHECK NO. | PAYEE | DISCOUNTS TAKEN | CHECK AMOUNT |
|---|---|---|---|---|
| 7/8/05 | 5111 | MACK TRUCK | | $144,000.00 |

**COMPONENTS BY JOHN MCCOY, INC.**
20 WEST 55TH STREET, PENTHOUSE
NEW YORK, NY 10019

JPMORGAN CHASE BANK
NEW YORK, NY 10019
1-2/210

5111

| | CHECK NO. | DATE | AMOUNT |
|---|---|---|---|
| | 5111 | Jul 8, 2005 | **$144,000.00 |

Memo:    2ND QUARTER ROYALTY

PAY    One Hundred Forty-Four Thousand and 00/100 Dollars
TO THE
ORDER    MACK TRUCK
OF:

AUTHORIZED SIGNATURE

⑃ SECURITY FEATURES INCLUDED. DETAILS ON BACK. ⑃

⑈005111⑈ ⑆021000021⑆01308241485⑈

EXHIBIT "D"



MACK TRUCKS, INC.
2100 MACK BOULEVARD
P.O. BOX M
ALLENTOWN, PA 18105-5000

October 24, 2006

Mr. John McCoy
Components by John McCoy                VIA UPS OVERNIGHT LETTER
20 West 55th Street                     Tracking #1Z3YY8000142036538
New York, NY 10019

Re: Termination Letter – Trademark License Agreement dated April 2, 2004

Dear John:

Please be advised that Mack Trucks, Inc. ("Mack") gives notice of the termination of a
certain **TRADEMARK LICENSE AGREEMENT** (Agreement) with Johnny M, LLC
that was effective April 2, 2004, due to the failure of Johnny M, LLC to perform under
the Agreement. Please note that Mack reserves all rights to collect unpaid portions of the
Guaranteed Minimum Royalties under the Agreement for the Initial Term thereof. Mack
reserves all rights to make demand upon Components by John McCoy, Inc.
("Components") and to collect from Components all sums payable under the guaranty
made by Components.

Mack demands that you continue to observe Mack's rights in its licensed Marks pursuant
to Section 18 and elsewhere in the Agreement. Mack further demands that Johnny M,
LLC return all materials and follow the procedures set forth in Section 20 and elsewhere
in the Agreement with respect to the termination.

Respectfully yours,

Randy DeLillo
General Manager, Licensing & Merchandising

cc: Mack Legal

EXHIBIT "E"

JOHNNY M., LLC
20 West 55th Street – Penthouse
New York, New York  10019


April 9, 2004


Mack Trucks, Inc.
2100 Mack Blvd.
Allentown, PA  18103

Gentlemen:

We write in connection with the proposed Trademark License Agreement between us.  Our LLC was originally formed under the name Johnny Mack, LLC by filing a Certificate with the New York State Department of State on February 3, 2004.  Effective today we have filed an Amendment to that Certificate changing our name to Johnny M., LLC.

The members of the Limited Liability Company are:  John McCoy, a holder of 85 percent of the membership units and Barry Wishnow, a holder of 15 percent of the membership units.  The managing member is John McCoy.

In connection with the Trademark License Agreement and upon the Effective Date thereof, Components By John McCoy, Inc. has agreed to and will execute a limited guaranty of our obligations under the Trademark License Agreement to you with the maximum liability of $500,000.  The exact form of that guaranty to be subject to our attorney's review, comment and approval.

You have also expressed some concern of our ability to make payment to our suppliers in a timely manner in order to assure a constant flow of goods.  We have entered into an agreement with CIT Group/Commercial Services to factor all of our accounts receivable.  The agreement is a standard agreement which provides, among other things, that immediately upon delivery to CIT of our invoice and shipping documents, they will advance to us   85   percent of such invoice.  We have also entered into a credit arrangement with our major supplier,     Fuda     , who

Mack Trucks, Inc.
April 9, 2004
Page 2

will ship to us finished goods for delivery to our customers on ten (10) days ROG terms, which, when combined with the factoring arrangements with CIT, will provide us with more than sufficient cash flow.

If you require any further information concerning the credit facilities available to our firm, please feel free to contact the undersigned.

Yours very truly,

JOHNNY M., LLC

By _John McCoy_

John McCoy

1810191

EXHIBIT "F"

Mack Trucks, Inc.

| ICE TE | INVOICE/CONTRACT NUMBER | DESCRIPTION | GROSS AMOUNT | DISCOUNT | NET AMOUNT |
|---|---|---|---|---|---|
| 1/06 | 123106. | | | | 25,000 - |
| | | 3rd installment of Initial Term | | | |
| | MKSHO 0/36266 | | | | |
| | | TOTALS | | | $ 25,000 - |

CHECK NO.

**SUCCESS APPAREL LLC**
19 WEST 34th STREET, 7TH FLOOR
NEW YORK, NY 10001

THE
BANK OF
NEW
YORK
277 PARK AVENUE
NEW YORK, NY 10172

CHECK DATE

1-1
210

053899

VENDOR NO. 50371

Twenty five Thousand Dollars and xx/

PAY EXACTLY

$ 25,000 xx/100.

Mack Trucks, Inc.

AUTHORIZED SIGNATURE

⑈053899⑈ ⑆021000018⑆ ⑈6301940570⑈

Sent to Beth 2/8/06

53814

053814

MACK Trucks. Inc.

**SUCCESS APPAREL LLC**

| ICE TE | INVOICE/CONTRACT NUMBER | DESCRIPTION | GROSS AMOUNT | DISCOUNT | NET AMOUNT |
|---|---|---|---|---|---|
| 1st | | Royalty Payment sent to Components) - This check represents the | | | $25,000 oc |
| 2ND | | Royalty Payment due 9/30/05 to mack | | | |
| | | | | **TOTALS** | $25,000 00 |

MKSHOP/362601

CHECK NO. 53814

**SUCCESS APPAREL LLC**
19 WEST 34th STREET, 7TH FLOOR
NEW YORK, NY 10001

THE BANK OF NEW YORK.
277 PARK AVENUE
NEW YORK, NY 10172

CHECK DATE 01/20/06   1-1/210 191

053814

VENDOR NO. 50311

PAY EXACTLY

Twenty Five Thousand Dollars and xx/100

$25,000 xx/100

THE ORDER OF

MACK Trucks.

AUTHORIZED SIGNATURE

⑆053814⑆ ⑈021000018⑈ ⑆6301940570⑆